Case number 21-1132. Michael Johnston, Avalanche v. Securities and Exchange Commission. Mr. Cohn for the Avalanche, Mr. Yoder for the Avalanche, Mr. Thurr for the Intervenor. Counsel, you may proceed. Good morning, your honors. Stephen Cohn for the petitioner, Michael Johnston. The SEC committed to first when it found that Johnston and Mittman were joint whistleblowers. Thereafter, when it ordered a payment of $13.5 million to a whistleblower who provided no original information. If I understand the commission's argument, which focuses almost entirely on that word provided, that it hinges on the two men you just mentioned appearing jointly to provide the information accompanied by a lawyer representing both of them. Is that correct? Yes. So why is it reasonable to say the two provided the information jointly? They both showed up. They provided the information. The reason is because the record shows that only Johnston provided original information. And the key here... Well, wait a minute. If all the information was provided by the two of them at the same presentation, how can one say that they didn't both provide it? Because only Johnston presented the backtesting information.  Only he spoke, and that's confirmed in an August 3 letter, JA-287. But more important, the definition of original information, which is the heart of this law, isn't predicated on presentation. It's part of it. Well, that's how the commission sees it. Exactly. That's their error. If you read the definition, only information that is derived from the independent knowledge or analysis of the whistleblower, you have to be the person with the real insider information. Now you're taking issue with their definition or the statutory definition of the whistleblower, which can be two or more persons. So what occurs is, and I'll get to that, but in the application for the award, filed by the lawyer for Mittman and Johnston, he stated as follows, Michael Johnston analyzed internal documents related to the backtest and discovered that to investors that was 48%, not 7%. Consequently, the only person who meets the definition of providing original information in the application was Johnston. The commission completely ignored that side of the argument. Johnston may have created the information, discovered it, what have you. They tend to take someone along with them to provide it. No, only Johnston presented it. The word is provided, not presented, right? Where is it on 287? You referred me to 287 to say that only Johnston spoke at the meeting. 287, it states as follows. This is the letter that was sent directly after the meeting. It's also confirmed in three different affidavits. There are numbered paragraphs. Which one is it? It's the very first sentence in response to your request following Michael Johnston's presentation concerning those funds. And then furthermore, a number of paragraphs three and four that the lawyer says Johnston will review and present later. But all of the affidavits that were filed after the commission made its error in the critical here, this is such an important fact, is that presentation gets you nothing. It gets you nothing. If you look at the statute, the definition of original information, the statute says is derived from independent knowledge and analysis. Not known to the commission. This is the presentation side from any other source unless the whistleblower is the original source of the information. In the application to the SCC. Whistleblower can mean two or more persons. The term whistleblower has two different meanings in the statute. First off, Mittman was a whistleblower. Is that a point on which the commission disagrees with you? They don't deal with that. They lump them together to their advantage. The definition of whistleblower covers those who seek protection under the anti-retaliation provision. You don't need to give original information. You only have to present information to the commission. That's digital, very clear about the Supreme Court. Congress was so focused on who do you give the money to. Not who do you protect like in a normal whistleblower statute, but who do you hand over potentially large sums of money. They laser focused on this concept of original information. And they said only that person. Now, how do we know that this lumping together doesn't work? Because if you look at the application process for an award, they don't say a whistleblower applies for an award. They say you in applying for an award. And that the statute, the regulation, the form says original information that you provide. So in the application process, the commission can weed out those who are mere whistleblowers. There's 60,000 of them. People who present, who give information, who may be helpful. That's great. Don't let them be fired. But if you're going to hand over potentially millions to a person, Congress wanted to get what it was paying for. They wanted to get, and if you look at the requirements, they wanted to get the real whistleblower, the person with the actual knowledge, the real insider. And then they had a series of other steps. One of those steps is you obviously have to give it to the commission and they have to have a successful enforcement action of over 1 million. They don't want trivial information. They want real solid information that can sanction a company for a million. And then there has to be a finding by the commission that your information contributed materially to that sanction. And the SEC investigator confirmed all of that. The SEC investigator said that back test was it, that the back test contributed. And then this whole thing on presentation, if you go through the affidavits, what you will see is only Johnston presented on back test. He discovered it, he presented it. So if you carefully just weave through it, you'll see every meeting that is identified as having original information, the back test, if you comb through the affidavit, I know it's a job, but you'll see it's only Johnston presenting. It was his discovery. Does everyone get a meeting? Pardon? Does everyone get a, does everyone who ultimately gets a reward previously have had a personal meeting with the commission? No. You only have to present, give the information you do by letter, TCR. Because you can be anonymous, you never have to show up and you never even have to give your name. At the application, you have to identify who you are to make sure you're qualified, but you never have to show up. Send it in, fill out the right form, over. So suppose in a case otherwise similar, two people, Johnston and Mittman in this case, developed, created, discovered the information. And one of them, Johnston, mails it to the commission. Is Mittman cut out? Yes, for only one reason. You do have to fill out the form and send it to the commission. The commission does have the discretion to waive that requirement and they have done it where justice so requires. So I would think in that type of case, they would probably waive. But that you have to understand the way Congress, and then when the SEC did their regs, you have to begin with this assumption. And in the first sentence of the legislative history on this law, original information. Then they carefully define it in this statute with the word means. Under digital, it's an absolute mandatory requirement, which means you have to be the one to develop it. You can see who they're trying to bring out, who they're trying to incentivize. Then once you have it, you have to give it to the commission, either anonymously or in some manner. Then you have to prove that that information was sanctioned. Johnston did all. Mr. Horne, I mean, was it impermissible for the SEC to conclude out of facts here that Mittman and Johnston were joint whistleblowers? Absolutely. Your main piece of evidence. I mean, your point is that they didn't jointly have original information, but it seems under the definition of whistleblower, the SEC was, you know, it was certainly plausible to consider them as joint whistleblowers. No. And the reason is, as I say, the definition of whistleblower includes two completely different classes of people. Those who present information can't retaliate. Those who present original information to the statute get an award. But more important... But that's, the original information is not part of the definition of whistleblower. But it is a requirement for a reward. I understand that, but I'm just saying at the level of defining who the whistleblower is here, why couldn't the Because, okay, a couple of reasons. Let's start with, neither ever said they were in 10 years. That Mittman, when he applied for the award, totally disavowed it. He said, I'm an individual, and he refers to Johnston as his former colleague. Not one shred of paper in 10 years says joint. But it gets better than that, because the letter that's their primary evidence, an August 6th, 2010 letter, where they talk about the team. If you read that letter, they don't say this is our formal complaint, or this is our original information. What they say is, we're preserving our rights, the rights of these three people. Then what happens is the SEC does its rules. Then Johnston asks his lawyer, contact the SEC. Do I have to do anything else? The answer is no. But what we know at the time is the SEC classified these cases under three different individuals and gave it three separate TCR numbers. And in the world of the SEC, this TCR is the big deal. That's how you're supposed to present your information, three separate numbers. Then when they apply for the award, both say they're filing individually. Where's the record? That it's joint. But what was on the record is that Johnston was the only one who gave the original information, because in the application itself, approved by a lawyer for omitment and Johnston, it set it straight up. It also said in that same application that Johnston was the one who presented the information. It's right in the application. And I can give you that site. It might take me a second to find it. So therefore, where's the evidence? Now, the other thing, to me, that is really incredibly important evidence was the first affidavit by the SEC investigator. They know who's giving the information. You're talking to them. She says, I know what Johnston gave. Yeah, because he gave it all, by the way. And I don't know what Mittman gave. She says that she has no idea what Mittman gave. But that's validated by all the affidavits, by the applications, because only Johnston presented it. And then what happened? Then she says, well, I'll call them joint whistleblowers, although I don't know what Mittman gave. That's erroneous. You just can't come up with a definition out of the blue sky if you don't know what someone actually gave or if they met the definition. I want to say one other thing. I know my time is running low, but you're only going to get a question, but which is we raised this original information directly in our appeal, administratively. We had the right to fully augment. It's essentially a de novo appeal. We raised it clearly, but in their final order, the commission completely ignored the argument, which to us is the centerpiece of entire law. They ignored the argument. They didn't even conclude that a joint whistleblower can somehow get around the original information requirement. They didn't even say that in their order. They don't even discuss it. I would say I know why they didn't say it, because Congress only wanted those with original information. You create exceptions to that requirement, and you will undermine the central reason Congress passed that law. Thank you very much. Thank you, Your Honor. May it please the court, Stephen Yoder for the Securities and Exchange Commission. In its final order, the commission reasonably determined that Johnston Amendment to be treated as a single whistleblower unit because substantial evidence in the record showed that they acted jointly in providing information to the commission. Is that because that primarily because of the use of the word team? That is one piece of information that is recited in the commission's final order. I would point the court to the supplemental declaration of Olivia Zak that is in the record, and specifically to Exhibit A, which appears at JA 352. I present this in distinction to what Mr. Cohn just presented. He pointed to JA 387, but if you look at 352, in the second paragraph, the first full sentence, counsel for both Johnston Amendment writes, on July 26 and 27, 2010, Michael Johnston and Michael Mittman appeared with me at your offices in New York and voluntarily presented to the SEC a portion of the original research and independent analysis developed by the Johnston team pertaining to the Falcon and ASTA MAT funds. In that sentence, both Johnston and Mittman are single meeting together. That was sufficient evidence for the commission to discount what was said in the other letter cited by Mr. Cohn in his opening argument. This is by their lawyer on behalf of them? Yes, this is by their lawyer on behalf of them. In addition, the Supplemental Zak Declaration also explains that at no point during this presentation or afterwards did either which pieces of information had been developed or being presented on behalf of particular individuals. Based on the whistleblower definition, then, the commission treated Johnston and Mittman as a single whistleblower unit and went on to conclude that they jointly satisfied the award eligibility criteria, including the requirement that a whistleblower must provide original information. And here, I would point your honors, as Mr. Cohn did, to the definition of whistle, or the definition of original information in Section 21F, A3. That definition talks about original information being provided by a whistleblower. And so, in that sense, it points back to the whistleblower definition appearing in Subsection A6. And so, the logically prior question is, who is the relevant whistleblower or whistleblower unit in this case? And that statute permits more than one person to qualify as a single whistleblower unit. And when those whistleblowers came into the commission and presented information, the commission thereafter essentially credited all of them, or I should say both of them, Johnston and Mittman, with all At that point, ex ante, nobody knew exactly what would prove most useful to the commission. It would be equally the case, for example, that Mittman could have provided or originated the most useful information to the commission. Let me ask you, in this situation, are you suggesting that the affidavit referred to by appellant and the affidavit to which you refer on behalf of appellee are not in direct contradiction to each other, and therefore, the commission couldn't simply ignore one without acknowledging the existence of the other, or at least somehow indicating that, for particular reasons, it gave more credit to one than another? If your honor is talking about the affidavits that Johnston presented to the commission, No, I'm talking about the way you set up the distinction. You said the commission could ignore the affidavit presented by appellant because there was this other affidavit, and you went on to describe it. And so I'm just asking, is that the proper way to look at the record here? Well, your honor, I would point out that my colleague, Mr. Cohn, pointed to a letter. It was not actually an affidavit from their counsel, and I did not mean to imply that the commission could ignore the letter that was in the record. What I meant to say was that where there exists ambiguity in a record as to what the facts are, the commission is permitted to choose between competing accounts of the facts, so long as there's a substantial evidence supporting the commission's version. And in this case, the letters are not necessarily contradictory. The letter cited by Mr. Cohn says that Mr. Johnston made a presentation, but it doesn't say that only Mr. Johnston made a presentation. For example, if it said only or exclusively, then there would be a better argument for an outright contradiction here. But arguably, it's consistent with the other letter that was attached to the Olivia Zak declaration. And that letter said that both Johnston and Mittman had presented at this meeting in late July 2010. Thank you for the clarification of your argument. Thank you, your honor, for pointing that out. Mr. Yoder, is it the commission's position that they need to determine who the whistleblower is before determining the question of whether whistleblower provided original information? I mean, that does seem to be part of the dispute between the two sides. Which question is prior? Yes, your honor. So, and I'm wondering, is it the commission's general practice to determine who the whistleblower is in every case first before addressing the second question? That is the general practice in terms of how whistleblower award applications are analyzed. The logically prior question is always, does this person qualify as a whistleblower under the definition? And then do they meet the additional criteria specified in the statute to be eligible for an award? So that is the mode of analysis. This case was somewhat unusual in that there was a dispute as to whether one or both of these the commission reasonably read the statute's definition of whistleblower to permit them to be treated as a single unit because they had provided information together to the commission. So one of the arguments that Congress drew a distinction between who can apply  and who can receive. Are you asking is there a distinction between who can apply and who can receive? I mean, certainly. That's my question. Yes. That's the argument that was presented. Yes. Anyone not understand that? No, I'm sorry. I had trouble hearing the audio, your honor. I apologize. I'll speak louder. Thank you. Anyone can apply for a whistleblower award as described in the commission's brief. The practices of the commission is that once a commission action results in monetary sanctions of $1 million or more, the commission's office of the whistleblower posts what's called a notice of covered action on the commission's public website, inviting interested persons to apply for whistleblower awards in connection with that covered action. And pursuant to that process, anyone can submit a whistleblower application regardless of whether they meet the whistleblower definition or the award eligibility criteria. But then the commission's office of the whistleblower takes those applications and processes them. And then the course of processing them, the initial question is, did this person actually meet the whistleblower definition? Let me be clear of the process that you're describing. In other words, the commission is no longer involved. Once the filing is accepted by the person who claims to be a whistleblower, the commission proceeds on that assumption. So then when the award issue comes up, it's an administrative determination. I'm not clear that that was the nature of appellate counsel. Yes, your honor. I don't believe that the commission ever makes the assumption one way or the other that a person who applies is necessarily a whistleblower or not. Those applications come in, they're received and processed by the commission's office of the whistleblower. But the way you were describing it, and this is just because I'm not familiar with the administrative process here. Understood. Suppose I apply. Yes. And we go through this whole proceeding and the commission is satisfied I'm a whistleblower. But then when the award comes up, it determines I've simply plagiarized somebody else's material. Does the administrative body say, well, it doesn't matter. It was original by somebody and you're the one who's come before us and that's good enough. Or does it say, hey, you're no longer a whistleblower. That's not what is intended in the award. I mean, does that issue ever get back to the commission? Whereas here, as you point out, a little unusual because that issue came up at the very threshold. Your honor, one point of clarification here, at the time a whistleblower provides information to the commission, the commission does not make a determination at that time as to whether or not they meet the whistleblower definition. What are you saying? You say I can apply. And at what point is the determination made whether, and as I understand it, there are at least two parts to the definition. And really appellant is focusing on the second part, not the first part. Your honor, the commission does not make any determination at the time information is provided. But when the office of the whistleblower receives an application, and that can be from anyone, then a determination is made whether the applicant meets the statutory definition of a whistleblower. If the record is unclear, if there's a case of plagiarism, as you suggested, then the office of the whistleblower will work with the relevant enforcement staff who brought the covered action to talk to them about who provided information during the investigation and whether that information was helpful. And that's the point at which any plagiarism would be uncovered. And then the office of the whistleblower prepares an initial recommendation that goes to a body of staff called the claims review staff within the Division of Enforcement. They make a preliminary determination recommending how the commission should decide the award applications. Then that preliminary determination is given to the claimants, and they can request the underlying supporting documentation if they wish, and they're given an opportunity to respond. Then the office of the whistleblower prepares a second recommendation in light of those responses, presents that initially to the claims review staff as a proposed final determination, and assuming that the claims review staff agrees, they then present that to the commission itself. And the commission, after considering it, issues a final order. So there was only one determination here by the commission as to whether or not these individuals were whistleblowers. That was at the final order stage. I hope that answers your honor's question. Yes, thank you. I'd like to take you back to something you said earlier, because I think I just lost the thread at the time. And that was the letter of 352 from the lawyer for the two claimants. And did you say, you pointed out that as between that and another document, there was not a contradiction? Yes. Because one of them didn't say that only Johnston presented information. Correct. And was that this letter at 352? Yes. The one that did not say only was the one cited by Mr. Cohn at 387. That one at 387 talks about Mr. Johnston making a presentation, but it does not say that only Johnston made the presentation, or that he did so exclusively. So that was the document I was referencing, your honor. This one seems to say, as I read this sentence, that both, quote, appeared with me at your offices and voluntarily presented to the SEC a portion of the original research and independent analysis developed by the Johnston team, which the Johnston and others defined as including, I think, three people. Yes. So that's, I mean, it says, doesn't it? They both appeared and they both voluntarily presented. Yes, your honor. I agree. I think the letter is clear on its face. And then if we go to 387, what do we see there? If you don't mind, I'll... Pardon me, your honor. I misspoke. It's 287, not 387. My apologies. In 287, the first sentence of the letter was quoted by Mr. Cohn. He states, in response to your request, following Michael Johnston's presentation... Okay. And where is the request? The request for information? Well, it's in response to your request. What request? Where is that? Yes. Apparently, at the July 26th and 27th meeting, as I understand the record here, after the presentation was made, discussions were had about a potential follow-up presentation to take place in August, 2010. And I think it's those discussions, that's my understanding, your honor. Those discussions are referenced here by the word request. So it was oral? The request was oral, is that what you're saying? It was, yes. It would have been in the commission's request or the, I should say, the staff of the commission's request. And that was not in writing? Not that I'm aware of. It's not in this record. Because this, even this, if depending on the help to Mr. Johnston, I mean, if the request is following, in response to your request, following Johnston's presentation. Well, if the request is, by the way, before Mittman spoke, I have a question about Johnston's presentation. Right. And your honor, we just don't have that level of granular detail here. So I would say that the letter is of very limited value to Mr. Johnston. I would agree, your honor. Well, maybe he'll have information on the request to which it was responded. Yes, exactly, your honor. And unless the court has further questions, the commission is prepared to rest on its brief. Thank you very much. Thank you. So, counsel for intervener? Yes, good morning, your honor. Justin Scherr, on behalf of intervener Michael Mittman, may it please the court. The appellant's argument rests on inserting words into the definition of whistleblower that just aren't in the statute. But the appellant is arguing that the court should analyze whether Mr. Mittman and Mr. Johnston jointly developed the original information, or whether they jointly requested to be treated as joint whistleblowers, or whether they actually ultimately submitted their whistleblower application jointly. Those words are not in the statute. All the whistleblower definition requires, the judge observed, is that the information be provided. And the record has ample evidence that they did so, and supports the example. The supplemental affidavit of the staff member from the SEC specifically says, and this is joint appendix 349, paragraph 5, where she says, in late July 2010, the Johnston team, in quotes, including Johnston and Mittman, identified a problem with the backtesting report, which meaningfully advanced the investigation. So, the record is very clear that they provided the information jointly. But even if, for some reason, the court looks to whether Mr. Mittman himself was involved in developing the information, there is also evidence in the record that he did so. There's a report that in his whistleblower application, he references having prepared himself, or primarily himself, and that's called a volatility report. That is the backtesting report that the appellant has identified as the primary source of original information. And that's on joint appendix page 182. In addition, there's also an email attached to that whistleblower application, joint appendix 228, where the counsel representing both Mr. Mittman and Mr. Johnston at the time presented that backtesting report. Again, it's called a volatility report. It said, this was prepared by my clients, plural, both clients. So, even if the court were inclined to look at whether Mr. Mittman was himself involved in developing this information, the record supports that and supports the SEC's decision as reasonable. Now, the record does not have affidavits from Mr. Mittman or affidavits from his current counsel explaining all of this because the administrative process at the SEC level did not allow for it. We did not know that Mr. Johnston was challenging Mr. Mittman's entitlement to a whistleblower. We did not see his affidavits addressing this. And so, Mr. Johnston argues that this issue is uncontested in his brief. There's a reason because we didn't know that this was an issue, and that's why the court to keep that in mind in considering whether the SEC's decision is reasonable. Was Mr. Arnold ever represented by Mr. Blumenfeld? When they were providing the information to the SEC, yes, they were pointly represented by that. All three? Correct. And then later, they were pulled out, and that's why they ultimately were here today. One other argument that the appellant makes in the merits is that they didn't submit their whistleblower applications for the award jointly. There is no mechanism. Whistleblower application asks for a single name, but Mr. Johnston did his best to signify, to signal to the SEC that we are joint whistleblowers. If you look at Joint Appendix page 14, he essentially says, I'm essentially what they tried. Just briefly on jurisdiction, if I may, Your Honor. The statutory regime does not allow an appeal based on the amount the SEC clarified. That includes an appeal based on the allocation of- I don't think anything that's been argued here today  is wrong. Well, I think ultimately what Mr. Johnston is asking- That's always- Everybody's here because they want more money. Fair enough. Nobody's here to give it away or what have you. Fair enough, Your Honor. But I think what the statute and the statutory regime intended was for a claimant who was denied an award to come to this court and say, I should have been able to participate. The SEC got it wrong. It should not be read to allow a claimant to come in and say that other claimant wasn't- The SEC got it wrong in giving that other claimant. That suggests that somebody could come up, a member of the public would come to this court and say, yes, you got it wrong about that stranger. Again, the only reason Mr. Johnston has- Well, that's standing in terms of somebody else coming to- Right. But the only reason Mr. Johnston has an argument that he has standing is because of the amount of his award. The SEC's decision was reasonable, and I ask you to- All right. Thank you. Counsel for appellant? Yes. I would first just like to address the concern about who presented the information. And what's very important is when Johnston filed his original application, all three were represented by the same lawyer who had primary responsibility for the case. Johnston had no idea that Mittman would file his own. So his application needs to be viewed in that light. But even in that light, in terms of presentation, JA32, the Johnston group arrived in New York. This is the July 26th office where Michael Johnston voluntarily provided sworn testimony and presented new original information and independent analysis to the SEC. He breaks from using the team and they say Johnston, but they didn't even know Mittman was going to go behind their back, but they say it that way. But even more interesting is JA67. Again, look what is stated here. Mr. Johnston's post-Dodd-Frank original information consisted of 6,391 pages of new independent analysis and his complete assistance, which was provided extensively to the SEC over 28 months. And then they go on. Mr. Johnston's post-Dodd-Frank original information did significantly contribute to the SEC's enforcement action. He's talking Johnston. I would even say if he said team, I could explain it because they didn't know what Mittman was up to. And remember, Mittman had access to this information. All this information before he filed on his own, break with the group and went in for his own money. And violation of all, you know, we don't need to get into the other agreements, but what we'll say is this is very clear. And why this is so significant is because of the affidavit of the SEC investigator, Zach. There is no conflict between her two affidavits. In her second affidavit, she reaffirms all of the arguments and statements she made in her first affidavit. And this is where it really comes down to. This is the record which was ignored. These are facts which the commission ignored. And this is critical. This is the SEC investigator. So the way you have to understand this is the investigators interact with the whistleblowers. And in this case, for a period of years, they really know everything. Then it goes to claims review and an independent group does it. But Zach's the one who worked with the whistleblowers, the whole team, for pretty much five years. Look what she says. Uncontradicted. Well, we had significantly more contact with Michael Johnston. We had no insight into how much Michael contributed to the materials. The application says it was all Johnston. The investigator who worked with them had no insight into Mittman. That supports the application. Then when Johnston saw the preliminary decision and realized the SEC got it wrong, he filed detailed affidavits. Now, Mittman says he couldn't file an affidavit. Absolutely not true. Anyone can file a statement to the SEC, augment the record on the basis of a preliminary determination. You don't have to be appealing it. Anyone can. It was right in the letter sent to everybody. Mittman knew he went behind Johnston's back. Mittman knew that he didn't give the information on back tests. And Mittman knew that he never alleged joint whistleblower status. And he also knew, which we didn't have at the time, in his own application, it was individual, former colleagues. He knew all that. He easily had the opportunity to augment the record he chose to file. Who wrote these words? These words would have been written either by firm or Mr. Blumenfeld. Okay, so this is submitted on behalf of Johnston. So these are, we can attribute these words to Johnston. Correct. Your application must be filed under oath. And at 67, you read to us Johnston's post-Dodd-Frank original information consisted of 63, 91 pages, right? Yes. That's Johnston speaking. And at 32, you also cited, which paragraph or what date is that? That's 32, JA 32, the paragraph that begins with July 26, 2010 morning. The Johnston group arrived, right? Yes. And there is a page here. Well, let's look at, for instance, 38. The Johnston group satisfies voluntary submissions requirements. That's the group. There's another point in here where the 63, 91 is referred to again. On one of these Roman numeral pages with the black box, you know what I'm talking about? Your honor. There it is. I think it's 52, 52. JA 52? Yeah. Middle bullet point. New original information included 6,391 pages of new independent analysis provided to the SEC. All Johnston group original information satisfies all whistleblowers. So, he's not claiming any uniquely individual proprietorship. Your honor. Everything is the group at this point. Remember, this was filed as an individual application of Mr. Johnston when he thought that this team that had existed 10 years before Dodd-Frank was even passed, not joint whistleblowers, but a team that had its own structure. They were financial advisors who worked together. He gave this document to Mr. Mittman. Mr. Mittman had opportunity to weigh in on it. At the time he did it, he had no idea that he would have to separate his contributions with Mittman. No idea whatsoever. But after we got the preliminary determination, we filed these detailed affidavits that did separate what happened in glorious detail. I mean, page after page. It's understood as a jointly, I'm going to say everyone agrees that there was a time when there was some sort of agreement among the three members of the team as to the division of proceeds. Exactly. And just so you know, and it's in the affidavit, going back to when they were working together financially, that division was predicated. You look at how much money each person contributed to the case, not the information, how much money. Johnston put up about a million. Mittman put up about 44,000. Okay. But the division is much more, well, I don't know. Do we know what the division was in the agreement? Yeah. As I said, it's the working relationship of the team. And it's in one of the affidavits, Johnston's and probably Arnold. The way the team had worked before Dodd-Frank was passed is they would look at how much money you put in. What was your skin in the game? It wasn't based on being joint. It wasn't based on the volume of information. It was on money. So does that mean that Arnold put in any money? Yeah, he put in money and Johnston paid like, I think, 92%. It's in the affidavit. And that was the understanding would be a simple rule of thumb. Johnston was in charge of the team. Arnold says he was the whistleblower. He had the original information. The lawyer for all three says Johnston discovered it, Johnston presented it. So if you're dividing contribution by original information, it's all Johnston. I read a letter from the lawyer, Blumenfeld, that said flat out Johnston and Mittman went to the SEC and presented the information. Correct. And that brings you to the other point. And I believe counsel for Mr. Mittman said so. At the time, no one knew what would be classified as a statute. Three requirements. You've maintained that only Johnston made the presentation. Blumenfeld's letter is to the contrary. Because they were thinking in terms of the team. It was not done to differentiate. And the presentation we're talking about here is the presentation on the back deck, which is the only presentation that is relevant. And the affidavits filed on the back deck are the only affidavits filed on the back deck. So the fact that Johnston was ignored completely by the SEC, make that point very clear. And what those affidavits lead to a conclusion is that the SEC is giving $13.5 million to a person who provided no original information as defined under the statute. I have your point on that. Thank you. All right, counsel, any further clarification in response? Just one thing. Just one thing very quickly. They said that the SEC doesn't determine whether you're a whistleblower until they review the applications. That is not correct. You become a whistleblower the moment you give information to the SEC. Because you're protected from retaliation. As I say, the definition of whistleblower has two distinct meanings. So Mittman was a whistleblower the moment he walked into that door, he became a whistleblower. But that doesn't mean you're entitled to an award. To entitled to an award, it's a separate criteria predicated on original information. And I would view only a strict application of that rule. You cannot let the commission just wander about. They have to give the money to precisely who Congress wanted to get a financial incentive as opposed to being protected from being fired or black. So I want to thank you. I see I've gone over my time. I want to thank you very much for this opportunity. Thank you. Thank you. We'll take the case under advisement.
judges: Rogers, Rao, Ginsburg